**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NORAMCO LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 21-1696-WCB |
| | § | |
| DISHMAN USA, INC., | § | **FILED UNDER SEAL** |
| | § | |
| *Defendant.* | § | |
| | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Noramco LLC ("Noramco") has filed a motion for summary judgment that defendant Dishman USA, Inc., ("Dishman") breached a supply agreement between the two parties by delivering a non-conforming product. Dkt. No. 68. Noramco filed an opening brief in support of its motion, Dkt. No. 69, Dishman responded, Dkt. No. 71, and Noramco filed a reply, Dkt. No. 73. Although Dishman has requested oral argument on Noramco's motion, Dkt. No. 74, the issues presented by the parties' briefs are sufficiently straightforward that the additional costs imposed on the parties by conducting oral argument in this case would not be justified. The request for oral argument is therefore denied. For the reasons set forth below, the motion for summary judgment is GRANTED.

I.    <u>**Background**</u>

This case involves a contract dispute regarding a supply agreement (the "Agreement") between Noramco and Dishman. Noramco, a manufacturer of active pharmaceutical ingredients ("APIs"), entered into the Agreement with Dishman, in which Dishman agreed to supply Noramco with olivetol, an ingredient used in the production of Noramco's APIs. Dkt. No. 69-2 §§ 1.2, 2.1. The Agreement provided that Dishman would produce the olivetol at Dishman's facility in

1

Lodariyal, India, and deliver the olivetol to Noramco. *Id.* §§ 1.7, 2.1. The Agreement further provided that the olivetol that Dishman supplied would comply with "current good manufacturing practices" ("cGMP" or "GMP") as required by standards promulgated by the U.S. Food and Drug Administration ("FDA"), the European Union ("EU"), and the Swiss Agency for Therapeutic Products ("Swissmedic"). *Id.* §§ 1.4, 4.1.

On February 26 through 28, 2020, before Dishman manufactured the olivetol to be supplied under the Agreement, Swissmedic and the European Directorate for the Quality of Medicines and HealthCare ("EDQM") inspected Dishman's facility in Lodariyal. Dkt. No. 69-7 at 1. On March 19, 2020, EDQM advised Dishman that the inspectors' conclusion was that Dishman's manufacturing site was "not compliant with EU GMP" and that the deficiencies identified by the inspectors constituted "a critical risk of producing products, which could be harmful to the patient." Dkt. No. 69-7 at 1. The March 19 letter further advised Dishman that "it is your responsibility to inform all your customers about this decision." *Id.* at 6. Subsequently, on April 20, 2020, Swissmedic issued a formal "Statement of Non-Compliance with GMP," stating that it found several "major" deficiencies at the Dishman facility, one of which was "critical."[1] Dkt. No. 69-8 at Part 3. The report added that Dishman's "approach on materials management . . . was considered as not in compliance with EU GMP," and that "[w]ithdrawal of the GMP certificate . . . issued by the French authority, is recommended."[2] *Id.* A detailed list of the deficiencies at the Lodariyal facility was sent to Dishman the following day. Dkt. No. 69-9.

---

[1] Throughout this litigation, the parties and the court have referred to Swissmedic's statement of non-compliance as "the Swissmedic report."

[2] In its brief, Dishman explains that "[t]here is no evidence [in] the record as to when the French Authority ultimately withdrew GMP certification for Dishman's plant, but it was not before April 20, 2020." Dkt. No. 71 at 5–6. It is undisputed, however, that Dishman's GMP certificate was revoked at some point after April 20, 2020.

In early March 2020, Dishman manufactured six batches of olivetol. Dkt. No. 69-12. On March 26, 2020, Dishman shipped those batches of olivetol to Noramco, which received the olivetol on April 2, 2020. *Id.* Dishman informed Noramco of the results of the Swissmedic and EDQM inspection two weeks later. Dkt. No. 69-17.

On April 18, 2020, after learning of the Swissmedic and EDQM inspection, Noramco notified Dishman of its concerns regarding the inspection results and the impact those results would have on the olivetol Noramco had received. Dkt. No. 69-18. The two parties then conferred for several months regarding the status of the olivetol. *See, e.g.*, *id.*; Dkt. Nos. 69-6, 69-21. On August 19, 2020, Noramco notified Dishman in writing that the olivetol Dishman supplied to Noramco did not comply with the Agreement. Dkt. No. 69-20. As part of that notification, Noramco requested that Dishman arrange for the material be returned to Dishman. *Id.*

In the correspondence between Dishman and Noramco, Dishman appears to have agreed to arrange for the return of the olivetol and to refund Noramco for the purchase, although Dishman disputes that proposition. *See* Dkt. No. 69-6 (Noramco employee proposing 70 percent of the refund be paid by the end of 2020 and the remainder by the end of the first quarter of 2021, and Dishman employee agreeing to pay "70% in Q4 2020" and "Q2 2021 for the last 30%"); Dkt. No. 69-21 (Dishman employee stating that he "will arrange for next week pickup" of the olivetol). When no portion of the refund was paid in the fourth quarter of 2020, Noramco asked Dishman when the refund would be made. Dkt. No. 69-6. Noramco represents that Dishman never responded to that inquiry. Dkt. No. 69 at 10. Noramco then brought this action.

Since filing its original complaint, Noramco has twice amended its complaint. After Dishman filed its answer to Noramco's Second Amended Complaint, Noramco moved for judgment on the pleadings. Dkt. No. 38. I denied that motion but struck the affirmative defense

of unclean hands from Dishman's answer.  Dkt. No. 46.  During the hearing on that motion, I discussed with the parties the possibility of an early summary judgment motion to resolve the potentially dispositive question whether the Swissmedic report, standing alone, is sufficient to establish that the olivetol was not produced in compliance with cGMP, as required by the Agreement.  Noramco has now filed such a motion.

## II.    Legal Standard

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must draw all factual inferences in favor of the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In the case of an issue on which the moving party bears the burden of proof at trial, the party seeking summary judgment must establish "the absence of a genuine factual issue," and if that party does not establish such an absence, "the district court should deny summary judgment even if no opposing evidentiary matter is presented."  *Resol. Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992).  However, "[o]nce a moving party with the burden of proof makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact."  *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003).

## III.    Discussion

Noramco argues in its motion that the Swissmedic report regarding Dishman's facility in Lodariyal conclusively establishes that the olivetol was not manufactured in compliance with cGMP, and that Dishman therefore breached the Agreement by delivering non-conforming product to Noramco.

To provide some background, under United States law a drug "shall be deemed to be adulterated" if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice."  21 U.S.C. § 351(a)(2)(B).  The term "current good manufacturing practice" as used in section 351(a)(2)(B) includes "managing the risk and establishing the safety of raw materials, materials used in the manufacturing of drugs, and finished drug products." *Id.* § 351.  A drug that is deemed adulterated may be seized by the federal government if the drug is introduced into interstate commerce. *Id.* § 334(a).

The requirement in the Agreement that the olivetol be compliant with cGMP therefore exists to ensure that the olivetol, which Noramco purchased to use in the manufacture of its APIs, would not be incorporated into a product that would become subject to seizure by virtue of being adulterated.  Accordingly, if the Swissmedic report conclusively establishes that the olivetol that was shipped to Noramco was adulterated or not manufactured in compliance with cGMP, there can be no genuine dispute of material fact that Dishman breached the Agreement by providing product that was not compliant with cGMP.  That issue raises the question whether a facility inspection report, such as the Swissmedic report, is sufficient to conclusively establish non-compliance with cGMP.

Courts have made clear that drugs produced in violation of cGMP are "per se adulterated, regardless of any other safety protocols [that the manufacturers] happen to use." *United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1323 (D.C. Cir. 2014).  In other words, if Noramco can establish that the olivetol was produced in a manner that was not compliant with cGMP, any evidence regarding the safety practices or the actual quality of the olivetol that Dishman delivered would be irrelevant to the question of adulteration.

Two district court cases shed light on the issue of what evidence is sufficient to establish that a particular drug or drug component was not compliant with cGMP. In the first, *Alra Laboratories, Inc. v. American Cyanamid Co.*, No. 92-cv-2252, 1996 WL 377070 (N.D. Ill. July 2, 1996), a pharmaceutical manufacturer brought a breach of contract claim against its customer when the customer rejected the manufacturer's shipments on the ground that the product was not compliant with cGMP. *Id.* at *1–2. The FDA had conducted inspections at the manufacturer's facility from late January through early March 1991. *Id.* at *1. Following the inspections, the FDA generated a report detailing the facility's non-compliance with cGMP, which the customer obtained in early March of 1991. *Id.* On March 13, 1991, the customer notified the manufacturer that it would cease acceptance of any future product and would return any undistributed product back to the manufacturer. *Id.*

Against that factual background, the court in *Alra* considered whether the drugs manufactured during the period when the FDA conducted its inspections were "adulterated as a matter of law." *Id.* at *4. The court denied summary judgment with respect to that issue because "the FDA reports did not cite any violations which directly affected [the drug] sold to [the customer]." *Id.* The court added that it was "not persuaded that general GMP violations, occurring anywhere in [the manufacturer's] plant, rendered all drugs manufactured during that time adulterated as a matter of law." *Id.*

In a second, more recent case in the same district, another court addressed the type of evidence sufficient to render a pharmaceutical product adulterated as a matter of law and held that the GMP violations established adulteration. In that case, *United States v. 286,161 Bottles*, No. 19-cv-3876, 2021 WL 2272402 (N.D. Ill. May 4, 2021), the district court distinguished the *Alra* case, concluding that because in the case before it the "violations affected [the manufacturer's]

facilities and manufacturing processes as whole," and all of the relevant products were in the manufacturer's affected facilities, all of the relevant products "qualif[ied] as adulterated." *Id.* at *3.

In this case, as in *286,161 Bottles*, the Swissmedic report makes clear that it applies to the entirety of Dishman's Lodariyal facility, with the exception of one unit of the facility, "Unit 9." Dkt. No. 69-8 at Part 3 ("The GMP non-compliance applies to all APIs, but it is not possible to express an opinion . . . with regard to the product(s) manufactured in Unit 9."). There is no dispute that the olivetol was produced in Unit 3C of the Lodariyal facility, and not in Unit 9. *See* Dkt. No. 69-10 at 3; Dkt. No. 68 at 6. Moreover, Swissmedic found a specific violation with respect to Unit 3C, noting that "[n]o cleaning validation was performed in Unit 3C," and that "[t]he execution of cleaning validation of [that] unit was considered particularly important." Dkt. No. 69-9 at 5. In view of that evidence and the decisions in *286,161 Bottles* and *Alra*, it is appropriate to conclude that the Swissmedic report is sufficient to establish that the Lodariyal facility was not compliant with cGMP at the time of the inspection.

Although this case differs from *Alra* and *286,161 Bottles* in that the investigation of Dishman's facility was conducted by the Swiss regulatory authority rather than the FDA, that distinction is not dispositive for two reasons. First, the Agreement explicitly defines "cGMP" as including the applicable FDA, EU, and Swissmedic standards for manufacturing practices. *See* Dkt. No. 69-2 § 1.4. Failure to comply with the Swissmedic standards for cGMP would therefore result in a breach of the Agreement even if that violation did not equate to a violation of United States law with respect to cGMP. Second, the cGMP standards are essentially equivalent across

the United States, the EU, and Switzerland.[3]  This case therefore cannot be distinguished from *Alra* and *286,161 Bottles* on the ground that the report was issued by Swissmedic rather than the FDA.

Notably, the defendant's expert, Dr. Rino Coladangelo, conceded that once a certificate of GMP compliance for a facility is revoked, any materials produced at that facility are deemed *per se* adulterated under United States law.[4]  Dkt. No. 69-22 at 43:12–25 ("Q:  And so in this case it means that the US will recognize the results of Swiss Medic's statement of noncompliance, correct?  A:  Correct.  Q:  And are you aware that in the US, if a facility is deemed noncompliant, as the Dishman facility was, according to you, as of April 20, that the products are deemed adulterated for purposes of US law, correct?  A:  Correct.").  It is therefore clear that the Swissmedic report is sufficient to establish that materials produced at the Lodariyal facility were deemed *per se* adulterated once Dishman's certificate of compliance was revoked.  However, Dishman argues that because Dishman's certificate of compliance was not formally revoked until April 20, 2020, at the earliest, the olivetol it shipped to Noramco in late March 2020 was not *per se* adulterated at that time and therefore was compliant with cGMP, as required by the Agreement.

Based on the materials provided to the court, it appears that the revocation of a certificate of compliance is effective as of the date of the inspection rather than the formal date of revocation.

---

[3]  As noted in the report of Noramco's expert, Dr. Laura Millichamp, "[t]he understanding and enforcement of GMP is equivalent across the EU, Switzerland, and the USA."  Dkt. No. 69-11 at 4.  Dr. Millichamp pointed out that both the United States and Switzerland have entered into mutual recognition agreements with the European Union that allow the countries "to rely on each other's inspection system, share information, and waive batch testing on import into their territories."  *Id.* at 8.  Dishman's expert, Dr. Coladangelo, generally agreed with that assessment.  *See* Dkt. No. 69-22 at 42:11–44:20.

[4]  A certificate of compliance is a certificate issued by a regulatory authority (in this case, Swissmedic) to a manufacturer that indicates the manufacturer is in compliance with cGMP.  *See* Dkt. No. 69-11 at 7.

The European Union procedures for inspections provide that when a statement of non-compliance is issued, "[e]xisting valid GMP certificates with conflicting information will be superseded and should therefore be withdrawn in accordance with the [European] Union procedure for the issue and update of GMP certifications." Dkt. No. 73-2 at 116. The EU procedure "for the issue and update of GMP certifications" provides that "[a] GMP certificate reflects the status of the manufacturing site at the time of the inspection." *Id.* at 83. That procedure adds that a GMP certificate "is a declaration of the status of GMP compliance *at a particular point in time* connected with a satisfactory inspection outcome." *Id.* at 82 (emphasis added). Those provisions of the EU procedures, read together, strongly suggest that the operative date for GMP compliance is the date of the inspection, not the date the certificate is actually issued or revoked.

Despite that authority, I am not prepared to hold on this record that the effective date of the revocation of a certificate of compliance is always the date of inspection, regardless of the intervening circumstances between the date of the inspection and the date that the certificate was formally revoked. In light of the record in this case, however, Noramco's motion can be resolved without definitively answering that question.

What is clear is that the Swissmedic and EDQM inspectors found Dishman's production facility to be non-compliant with cGMP standards following their inspection in late February 2020. Based on that inspection, Swissmedic recommended in its April 20, 2020, statement of non-compliance that Dishman's certificate of compliance with the cGMP standards be revoked, and the French regulatory authority revoked the certificate at some point thereafter. The effect of that action was to render any product produced by the affected portions of that facility per se adulterated until the certificate was reinstated. The question before the court, then, is whether there is any reason to believe that products manufactured in the affected portions of Dishman's facility between

late February and April 20 should not be deemed adulterated.  Dishman makes several arguments in support of that position, none of which is persuasive.

Dishman's principal argument amounts to a contention that the requirement in the Agreement that the olivetol be "in compliance with cGMP's," Dkt. No. 69-2 § 4.1, means simply that Dishman must have had a valid certificate of GMP compliance at the time it shipped the material.

That interpretation of the Agreement is unpersuasive.  As noted, the purpose of the provision in the Agreement requiring cGMP compliance is to protect Noramco from purchasing APIs that would result in a drug being deemed adulterated under U.S. law.  The adulteration provision of the Federal Food, Drug, and Cosmetic Act defines adulteration as occurring when "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice."  21 U.S.C. § 351(a)(2)(B).  That language focuses on the actual conditions at the facilities at which the drug is manufactured, processed, packed, or held, and not on whether those facilities maintained a valid GMP certificate.  The Agreement thus aligns with the requirements of section 351(a)(2)(B).  Dishman would therefore be in breach of the requirement that it conform to cGMP if the conditions at its facility did not meet those standards, regardless of whether Dishman held a valid GMP certificate at the time it produced and shipped the olivetol.

In order to prevail under the terms of the Agreement, Dishman would need to show that the conditions at Dishman's Lodariyal facility were compliant with cGMP at the time the olivetol was produced.  Swissmedic inspected the Lodariyal facility between February 26 and February 28, 2020.  Absent some evidence of a change in the facility's compliance with cGMP between that

10

inspection and the time when the olivetol was produced in March 2020, a strong inference can be drawn that the facility was not compliant with cGMP when the olivetol was produced. Although Dishman was uniquely positioned to point to any evidence that the manufacturing conditions at the facility, and by extension the facility's non-compliance with cGMP, changed in any material respect between the date of the inspection and the time the olivetol was manufactured, it has not done so. There is therefore no genuine dispute of material fact regarding whether the olivetol was manufactured under conditions that did not conform to cGMP.

In its brief, Dishman raises several other arguments, none of which is sufficient to overcome Noramco's motion for summary judgment. Dishman first argues that it was unaware of Swissmedic's conclusion that the Lodariyal facility was not cGMP compliant until Swissmedic issued its statement of non-compliance on April 20, 2020. That argument is unpersuasive for two reasons. First, Dishman's knowledge of the cGMP violations is irrelevant to the question whether the olivetol was in fact produced under conditions that were not compliant with cGMP. Second, and in any event, Dishman received notice of the violations in the March 19, 2020, letter from EDQM, which was sent before Dishman shipped the olivetol to Noramco. That letter further informed Dishman that "it is your responsibility to inform all your customers about this decision." Dkt. No. 69-7 at 6. Dishman was thus aware that the regulators had found violations at the Lodariyal facility before Dishman shipped the olivetol to Noramco, yet Dishman shipped the olivetol without notifying Noramco of the cGMP violations.

Dishman next argues that the EU inspection procedures provide for an appeal process. That observation does not help Dishman. Following the February inspection, Dishman requested reconsideration of the decision to suspend the certificates of suitability for two other products manufactured at Dishman's Lodariyal facility. That request was denied in an order noting that the

inspectors had found that the Lodariyal "manufacturing site is not compliant with EU GMP," Dkt. No. 69-16 at 1, and confirming the finding of the inspection team "that there was a serious risk for the safety of human patients or animals due to the critical and major deficiencies raised by the inspection." *Id.* at 2.

Dishman further argues that Noramco could have inspected the olivetol and might have determined that the olivetol was safe to use notwithstanding the Swissmedic report. That argument fails because drugs produced in violation of cGMP are treated as "per se adulterated" regardless of the actual quality of the drug. *Regenerative Scis., LLC*, 741 F.3d at 1323. The Agreement did not require Noramco to undertake testing or to accept the olivetol in the absence of proof through testing that it was in fact adulterated. As the terms of the Agreement make clear, it was enough that the olivetol was produced in violation of cGMP.

Finally, in support of its interpretation of the Agreement, Dishman argues that it is entitled to discovery regarding another product, menthadienol, that Noramco purchased from Dishman in December 2019 and accepted in January 2020. In Dishman's view, that evidence of "the course of dealing between the parties" would establish that cGMP compliance, as that phrase is used in the Agreement, is based on "whether Dishman held a valid cGMP compliance certificate at the time of shipment." Dkt. No. 71 at 14. Discovery on that issue would be pointless, however, for two reasons. First, the menthadienol was produced more than two months prior to the Swissmedic inspection, whereas the olivetol was manufactured after the inspection occurred. *See id.* Noramco's decision to accept the menthadienol under those circumstances therefore sheds no light on Noramco's interpretation of the Agreement with respect to cGMP compliance. Second, contrary to Dishman's contention, the menthadienol transaction would not amount to a course of dealing between the parties supporting Dishman's interpretation of the Agreement. A single

12

transaction "does not constitute a course of dealing between the parties." *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. 08-cv-1101, 2009 WL 3672452, at *4 (D.N.M. Oct. 2, 2009) (applying Delaware law); *see also* 6 Del. C. § 1-303(b) (defining "course of dealing" as "a *sequence of conduct* concerning *previous transactions* between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct" (emphases added)).  For those reasons, any discovery regarding Noramco's treatment of the menthadienol that it purchased from Dishman would be irrelevant to the disposition of the present motion.

In view of the summary judgment record, Noramco has established there is no genuine issue of material fact as to whether Dishman breached the Agreement by delivering olivetol that was not compliant with cGMP.  Dishman has not come forward with sufficient evidence to demonstrate that there is a triable issue of fact on that question.  Accordingly, summary judgment will be granted to Noramco on its breach of contract claim.

### IV.    Conclusion

In summary, there is no genuine dispute of material fact with respect to whether Dishman breached the Agreement by providing olivetol that did not comply with cGMP.  Noramco's motion is therefore GRANTED with respect to liability.

The parties are directed to meet and confer regarding the remedy to be awarded to Noramco.  The parties should file a status report notifying the court of the results of that meet and confer by January 6, 2023.  If the parties can agree on a remedy, they should docket a proposed form of judgment along with the status report.  If the parties are unable to agree on a remedy, they should file simultaneous briefs of no more than ten pages each by January 13, 2023, explaining their positions with respect to the remedy to be awarded to Noramco.

In an abundance of caution, this order has been filed under seal because the parties' briefs regarding the present motions were filed under seal. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal. Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order. The court notes that the only portions of the parties' briefs that have been designated as confidential are quotations in Noramco's opening brief from the parties' experts' depositions. The court is aware of no legal basis for keeping references to statements in expert depositions sealed unless the experts' statements disclose information that is itself confidential. If there is any basis for protecting such materials from disclosure on the public record, the parties should advise the court with specific reference to authorities requiring such treatment of expert testimony of the sort at issue in this case.

IT IS SO ORDERED.

SIGNED this 19th day of December, 2022.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE