IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORAMCO LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 21-1696-WCB |
| DISHMAN USA, INC., | § § § | |
| *Defendant*. | § § § | |

## MEMORANDUM OPINION AND ORDER

On December 19, 2022, I granted summary judgment to plaintiff Noramco LLC, holding that defendant Dishman USA, Inc., breached a supply agreement between the two parties. Dkt. No. 75 at 13. In my order granting Noramco's motion, I directed the parties to confer regarding the remedy to be awarded to Noramco and to submit briefs if agreement could not be reached on that issue. *Id.* The parties could not agree on a remedy and subsequently filed two rounds of simultaneous briefing on the issue of damages. Dkt. Nos. 83–84, 88–89. I construe the parties' submissions as cross-motions for summary judgment on the issue of damages. Dishman has also filed a motion to dismiss for lack of subject matter jurisdiction. Dkt. No. 82. For the reasons set forth below, both motions for summary judgment on damages are GRANTED IN PART and the motion to dismiss is DENIED.

### I.     Background

This case involves a contract dispute regarding a supply agreement (the "Agreement") between Noramco and Dishman. Noramco, a manufacturer of active pharmaceutical ingredients ("APIs"), entered into the Agreement with Dishman, in which Dishman agreed to supply Noramco with olivetol, an ingredient used in the production of Noramco's APIs. Dkt. No. 69-2 §§ 1.2, 2.1.

1

The Agreement provided that Dishman would produce the olivetol at Dishman's facility in Lodariyal, India, and deliver the olivetol to Noramco. *Id.* §§ 1.7, 2.1. The Agreement further provided that the olivetol that Dishman supplied would comply with "current good manufacturing practices" ("cGMP" or "GMP") as required by standards promulgated by the U.S. Food and Drug Administration, the European Union, and the Swiss Agency for Therapeutic Products ("Swissmedic"). *Id.* §§ 1.4, 4.1.

Between February 26 and 28, 2020, before Dishman manufactured the olivetol to be supplied under the Agreement, Swissmedic and the European Directorate for the Quality of Medicines and HealthCare ("EDQM") inspected Dishman's facility in Lodariyal. Dkt. No. 69-7 at 1. That inspection resulted in a finding that Dishman's facility was not compliant with cGMP. *Id.* As explained in more detail in my order regarding Noramco's summary judgment motion, Dkt. No. 75, the results of the inspection compelled a conclusion that, as a matter of law, the olivetol had to be treated as having been produced under conditions that were not compliant with cGMP.

A brief recitation of the events following the production of the olivetol that was delivered to Noramco is relevant to the damages issue currently before the court. In early March 2020, Dishman manufactured six batches of olivetol. Dkt. No. 69-12. On March 26, 2020, Dishman shipped those batches of olivetol to Noramco, which received the olivetol on April 2, 2020. *Id.* Dishman informed Noramco of the results of the Swissmedic and EDQM inspection two weeks later, on April 16, 2020. Dkt. No. 69-17.

On April 18, 2020, after learning of the Swissmedic and EDQM inspection, Noramco notified Dishman of its concerns regarding the inspection results and the impact those results would have on the olivetol Noramco had received. Dkt. No. 69-18. The two parties then conferred for several months regarding the status of the olivetol. *See, e.g., id.*; Dkt. Nos. 69-6, 69-21. On

August 19, 2020, Noramco notified Dishman in writing that the olivetol Dishman supplied to Noramco did not comply with the Agreement. Dkt. No. 69-20. As part of that notification, Noramco requested that Dishman arrange for the material be returned to Dishman. *Id.*

In the correspondence between Dishman and Noramco, Dishman appears to have agreed to arrange for the return of the olivetol and to refund Noramco for the purchase, although Dishman disputes that proposition. *See* Dkt. No. 69-6 (Noramco employee proposing 70 percent of the refund be paid by the end of 2020 and the remainder by the end of the first quarter of 2021, and Dishman employee agreeing to pay "70% in Q4 2020" and "Q2 2021 for the last 30%"); Dkt. No. 69-21 (Dishman employee stating that he "will arrange for next week pickup" of the olivetol). When no portion of the refund was paid in the fourth quarter of 2020, Noramco asked Dishman when the refund would be made. Dkt. No. 69-6. Noramco represents that Dishman never responded to that inquiry. Dkt. No. 69 at 10. Noramco then brought this action.

## II.  The Terms of the Agreement

The parties' Agreement governing the purchase of the olivetol contains several provisions that are relevant to the determination of damages in this case. The general provisions of the Agreement make clear that "disputes with respect to non-conforming Material" are governed by Section 4.3 of the Agreement. Dkt. No. 69-2 § 12.3; *see also id.* § 12.4 (same).

Section 4.3.1 of the Agreement sets forth the procedures that Noramco was required to follow in order to reject material that it believed to be non-conforming. First, that section makes clear that, in order to reject the olivetol it received, Noramco was required to notify Dishman of its rejection within 30 business days of receiving that material. *Id.* § 4.3.1. That section adds that if Noramco discovered a latent defect after the 30-day notification period ended, Noramco could still enforce its rights under the Agreement if Noramco notified Dishman of its rejection within 15

3

business days of the date on which Noramco discovered or should have discovered the defect. *Id.* Section 4.3.1 further adds that Noramco "shall be responsible for storage and handling [of] the Material" upon delivery. *Id.*

Section 4.3.2 of the Agreement outlines the procedures for resolving disputes regarding the conformity of the olivetol to the contract specifications. Specifically, that section explains that if Dishman and Noramco did not agree as to whether the olivetol was non-conforming, the parties were required to "use reasonable efforts to resolve such disagreement as promptly as possible." *Id.* § 4.3.2. Those efforts could include, but were not limited to, submitting a sample of the olivetol to a testing laboratory. *Id.*

Section 4.3.3 of the Agreement provides the remedies available to Noramco in the event that the olivetol was determined to be non-conforming. That section provides that Noramco may withhold payment for any rejected material or receive a refund of prior payments for that material. *Id.* § 4.3.3. That section adds that if the olivetol is "accepted by [Dishman] as not meeting the applicable requirements" or "is determined by the Laboratory not to meet such requirements or the specifications," the olivetol should be either returned to Dishman or disposed of "as directed by [Dishman], at [Dishman's] expense." *Id.* Section 4.3.3 further provides that "[t]he remedies provided by this Section 4.3.3 shall be the sole and exclusive remedies of [Noramco] in respect to any out of Specification material that was rejected." *Id.*

Section 12.4 of the Agreement provides an arbitration clause, which forms the basis for Dishman's motion to dismiss for lack of subject matter jurisdiction. That section states that "any dispute or claim arising out of or in connection with this Agreement or the performance, breach or termination thereof" shall be submitted to arbitration. *Id.* § 12.4. However, section 12.4 by its

4

terms does not apply to "any disputes with respect to non-conforming Material, which shall be resolved in accordance with Section 4.3." *Id.*

### III. Damages

I begin by addressing the parties' proposals regarding damages in this case. Noramco requests damages in the amount of the purchase price it paid for the olivetol, along with the storage, disposal, and financing costs associated with the olivetol transaction. Noramco also requests prejudgment interest, postjudgment interest, and attorneys' fees. Dishman opposes Noramco's requests on several grounds. Because the parties' disputes turn exclusively on legal questions, or present questions on which there is no genuine dispute of material fact, the court can resolve those disputes on a summary judgment basis.

#### A. Failure to Timely Reject

Dishman first argues that Noramco is not entitled to any damages because Noramco failed to timely reject the olivetol in accordance with Section 4.3.1 of the Agreement. That provision requires that Noramco reject the olivetol within 30 days of receiving the olivetol, or in the alternative, within 15 days of the time Noramco discovered or should have discovered a latent defect in the product. *Id.* § 4.3.1. Dishman argues that because the olivetol was delivered on April 2, 2020, and Noramco did not formally reject the olivetol until August 19, 2020, Noramco did not timely reject the olivetol under Section 4.3.1 of the Agreement. There are two problems with that argument.

First, Dishman has forfeited the right to assert as a defense that Noramco failed to timely reject the olivetol. Despite Noramco's request in its motion for summary judgment that the court enter judgment for Noramco "inclusive of Noramco's demand for damages," Dkt. No. 69 at 20, Dishman did not assert in its answering brief that Noramco would not be entitled to damages,

5

based on Noramco's allegedly untimely rejection of the olivetol, even if the olivetol were found to be non-compliant with cGMP.[1] *See generally* Dkt. No. 71.  Although it is true that Dishman raised that defense in its answer, Dishman's failure to raise that defense at the summary judgment stage results in a forfeiture of that defense. *See Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (upholding dismissal of claims after party did not oppose dismissal in response to summary judgment motion); *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1366–67 (Fed. Cir. 2003) ("[T]he defendants' argument[] as to the non-liability of the secondary defendants was waived when it was not raised in response to the motion for summary judgment."); *Dunhill Asset Servs. III, LLC v. Tinberg*, No. 09-5634, 2012 WL 3028334, at *6 (N.D. Ill. July 23, 2012) ("Defendants' answer raises other affirmative defenses, but those defenses are not pressed in their summary judgment brief and therefore are forfeited."); *Est. of Miller v. Thrifty Rent-A-Car Sys., Inc.*, 637 F. Supp. 2d 1029, 1036 (M.D. Fla. 2009) ("[A]rguments not raised in response to a summary judgment motion are considered abandoned.").

Second, even if the defense were not forfeited, there is no genuine dispute of material fact with respect to whether Noramco timely rejected the olivetol.  It is undisputed that Noramco contacted Dishman regarding its concerns about the Swissmedic inspection on April 18, 2020, which was 16 days after Noramco received the olivetol and two days after it learned of the Swissmedic and EDQM inspection. Dkt. No. 69-18.  At that point, the defect (i.e., the cGMP non-compliance) was still latent because it was unclear to Noramco whether the olivetol would still be

---

[1] Dishman stated in the "Summary of the Argument" section of its brief that "Noramco failed to follow the procedures set forth in the Supply Agreement . . . that require inspecting, testing and timely rejecting of product supplied by Dishman." Dkt. No. 71 at 2.  Dishman failed to elaborate on that assertion in any detail in its brief, however, and it also failed to suggest that Noramco's alleged failure to follow the procedures set forth in the Agreement would amount to an independent basis for awarding no damages regardless of the court's conclusion regarding the cGMP status of the olivetol.

usable. *See id.* (Noramco asking, among other things, whether Dishman intended to respond to EDQM and whether the report impacts materials that were manufactured in the same areas or using the same equipment as the olivetol). In response, Dishman indicated that it believed the olivetol was still usable and promised to provide a "risk analysis" within "the next week or two." *Id.* There is no evidence in the record that either Dishman or Noramco reached a conclusive determination that the material was unusable before Noramco formally rejected the olivetol in August 2020. *See* Dkt. No. 69 at 9–10. Instead, Noramco represents that it was "waiting for a further reply from Dishman, which never came." *Id.* at 10. On the record before me, there is no basis to conclude that Noramco discovered or should have discovered that the olivetol was non-compliant with cGMP more than 15 days before Noramco formally rejected the olivetol.

### B. Failure to Mitigate

Dishman also argues that Noramco failed to mitigate damages because Noramco sampled a number of barrels containing the olivetol that was delivered under the Agreement, an action that Dishman argues "rendered the Olivetol unusable by any other customer." Dkt. No. 83 at 10. That argument is unpersuasive, however, in view of the court's conclusion that Dishman delivered "olivetol that did not comply with cGMP." Dkt. No. 75 at 13. Because the material was not compliant with cGMP, it could not be used by another customer in any event. Accordingly, Noramco's decision to sample some barrels of the olivetol did not amount to a failure to mitigate damages.

### C. Limitation of Liability Clause

Dishman next argues that even if Noramco is entitled to some amount of damages, it is limited to the remedies specified in Section 4.3.3 of the Agreement. That section provides that in the event that Noramco rejects the olivetol, Noramco is entitled to withhold payment for the

olivetol or to receive a refund for payments made for the olivetol. Dkt. No. 69-2 § 4.3.3. Section 4.3.3 also provides that Dishman will be responsible for covering expenses associated with either returning the material to Dishman or disposing of the material in the event that Dishman agrees that the material does not meet the applicable requirements or that the material is "determined by the Laboratory not to meet such requirements." *Id.* Section 4.3.3 further indicates that "[t]he remedies provided by this Section 4.3.3 shall be the sole and exclusive remedies of [Noramco] in respect to any out of Specification material that was rejected." *Id.*

In light of the "sole and exclusive remedies" clause in Section 4.3.3, Dishman argues that Noramco is entitled to only the purchase price of the olivetol. I agree with Dishman that Section 4.3.3 limits the available remedies in the event of a dispute over non-conforming material, and that Section 4.3.3 contemplates an award in the amount of the purchase price. However, Dishman overlooks that Section 4.3.3 also contemplates that Dishman would cover the expense of disposing any non-conforming material. *See id.* Although by its terms the Agreement provides for recovery of the expense of disposing of non-conforming material if Dishman agrees that the material was non-conforming or if a laboratory makes that determination, the clear intent of the parties in adopting that language was to render Dishman responsible for the disposal costs in the event that the olivetol is found to be non-conforming. *See id.* Because I have determined as a matter of law that the olivetol was non-conforming as a result of being non-compliant with cGMP, I conclude that the cost of disposing of the olivetol is also contemplated as a remedy by Section 4.3.3 and will therefore be awarded along with the purchase price.

For its part, Noramco argues that the limitation of liability clause in Section 4.3.3 does not apply because the essential purpose of that clause has failed. Under Delaware law, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may

8

be had as provided in [Title 6 of the Delaware Code]." 6 Del. C. § 2-719(2). Noramco contends that "Dishman's failure to promptly direct the return/disposal and replacement/refund in any commercially reasonable amount of time" has caused the essential purpose of the limitation of liability clause to fail. Dkt. No. 89 at 3–4.

It is true that Section 4.3.3 requires Dishman to replace any rejected material "within the shortest possible time, but in any event, within a reasonable timeframe." Dkt. No. 69-2 § 4.3.3. However, that section goes on to provide that Noramco may receive a full refund for the olivetol "if [the] Parties cannot agree on a suitable timeframe to replace such rejected Material." *Id.* In other words, the Agreement expressly contemplates the possibility that Dishman would not promptly replace the olivetol if it were rejected by Noramco. In that event, the Agreement provides that Noramco's remedy is to receive a full refund of the purchase price. I therefore find that there is no basis to conclude that the limitation of liability clause failed its essential purpose.

The parties also dispute whether the limitation of liability clause precludes recovery of the costs that Noramco incurred in storing the olivetol following its rejection of the olivetol. Dishman argues that Section 4.3 does not expressly provide for an award of storage costs, and instead states that Noramco "shall be responsible for storage and handling [of] the Material . . . upon delivery." *Id.* § 4.3.1. Notwithstanding the language of Section 4.3 of the Agreement, Noramco argues that it would be "unjust and unfair to allow Dishman to benefit from intentionally shipping non-conforming goods to Noramco without first informing Noramco" of the Swissmedic inspection results. Dkt. No. 89 at 5–6.

I agree with Dishman that Section 4.3 of the Agreement does not provide for an award of storage costs. The express limitation of remedies to "[t]he remedies provided by this Section 4.3," read together with the statement that Noramco shall be responsible for "storage" of the olivetol,

9

plainly indicates that the parties did not intend for Noramco to be permitted to recover storage costs. *See* Dkt. No. 69-2 § 4.3. Noramco's suggestion that Dishman intentionally shipped non-conforming goods is unpersuasive because Noramco's choice to store the olivetol during the pendency of this lawsuit, rather than destroying it, suggests that Noramco believed there was some likelihood that Dishman would be found not to have breached the Agreement. I conclude that there is no justification to depart from the plain terms of the Agreement, which do not permit Noramco to recover storage costs in the event that Dishman delivers non-conforming material.

With regard to the financing costs Noramco has requested, Noramco does not argue that Section 4.3 permits an award of financing costs. And I discern no provision in that section or elsewhere in the Agreement that would support a conclusion that such an award is permitted under Section 4.3.

In any event, some courts have recognized that an award of financing costs and an award of prejudgment interest can serve the same general purpose, namely, putting the plaintiff "in as good a position as it would have been had [the defendant] not breached the contract." *Masters Mach. Co. v. Brookfield Athletic Shoe Co.*, 663 F. Supp. 439, 443 (D. Me. 1987). As the Second Circuit has explained, the rate used in computing prejudgment interest "is an assumption about the value of the use of money," whereas an award of the actual interest charges incurred by the party indicates the "actual value of the use." *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 485 (2d Cir. 1983) (emphases omitted). Other courts have held to the contrary, indicating that recovery of interest payments is not duplicative of prejudgment interest. *See, e.g.*, *Minpeco, S.A. v. Hunt*, 686 F. Supp. 420, 427 (S.D.N.Y. 1988); *Havens Steel Co. v. Randolph Eng'g Co.*, 813 F.2d 186, 188 (8th Cir. 1987) (applying Missouri law) ("In Missouri, a claim for the cost of money used to pay expenses necessitated by a breach of contract is a claim for damages, not

10

prejudgment interest."). Because I have concluded that financing costs are not recoverable under Section 4.3 of the Agreement, I need not decide whether Noramco's request for financing costs is entirely duplicative of its request for prejudgment interest. However, because Noramco is entitled to prejudgment interest in this case, as explained in more detail below, there is a substantial likelihood that financing costs would not be a permissible award of damages even if they were contemplated by Section 4.3 of the Agreement. *See Masters Mach.*, 663 F. Supp. at 443; *Intermeat, Inc. v. Am. Poultry Inc.*, 575 F.2d 1017, 1024–25 (2d Cir. 1978).

Accordingly, I conclude that the limitation of liability clause in Section 4.3 of the Agreement limits Noramco's damages to an award of the purchase price plus the costs incurred to destroy the olivetol.

### D. Interest

The parties also dispute whether Noramco is entitled to prejudgment interest. Noramco argues that prejudgment interest is awarded as a matter of right, while Dishman argues that an award of prejudgment interest is precluded by the limitation of liability clause in Section 4.3 of the Agreement. Under Delaware law, prejudgment interest is awarded as a matter of right and not as a matter of judicial discretion. *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485 (Del. 2011). The question presented by this dispute is whether the limitation of liability clause in Section 4.3 of the Agreement functioned to limit the parties' right to obtain prejudgment interest.

The Supreme Court of Delaware addressed a similar issue in *State Farm Mutual Automobile Insurance Co. v. Enrique*, No. 474, 2010, 2011 WL 1004604 (Del. 2011). In that case, judgment was entered against an insurance company, and the relevant insurance policy limited the damages recoverable under the policy to $100,000. *Enrique*, 2011 WL 1004064, at *1. The

11

insurance company argued that the policy limit of $100,000 also applied to any award of prejudgment interest, but the court disagreed. *Id.* at *1–2. The court explained that prejudgment interest is a "litigation cost" that was "associated with the defense costs and strategy in the case," rather than "an element of damages controlled by the . . . policy's coverage limits." *Id.* at *2.

Dishman has cited only one case, from an intermediate appellate court in Colorado, in support of its position. In that case, the court held that a limitation of liability clause applied to prejudgment interest because "prejudgment interest is a form of damages," and the relevant clause of the contract explicitly applied to "damages." *Taylor Morrison of Colorado, Inc. v. Terracon Consultants, Inc.*, 410 P.3d 767, 775 (Colo. Ct. App. 2017). That case is unpersuasive for two reasons. First, the Supreme Court of Delaware has indicated that prejudgment interest in the context of a limitation on liability is a "litigation cost" rather than "an element of damages." *Enrique*, 2011 WL 1004604, at *2. Because the Agreement is governed by Delaware law, the *Enrique* case is a stronger indication of the parties' intent with respect to prejudgment interest than the *Taylor Morrison* case. *See* Dkt. No. 69-2 § 12.2. Second, the Agreement in this case, unlike the contract in the *Taylor Morrison* case, never explicitly invokes the term "damages" in the limitation of liability clause. *See id.* § 4.3.3.

Given the above authority, I conclude that the limitation of liability clause in Section 4.3.3 of the Agreement does not limit Noramco's right to obtain prejudgment interest in this case. Accordingly, prejudgment interest will be awarded to Noramco at the statutory rate of 5.25%.[2] The prejudgment interest award will run from the date that Dishman first breached the contract, March 26, 2020, which is the date that Dishman shipped the non-conforming material to Noramco.

---

[2] Delaware law defines the rate of prejudgment interest as "5% over the Federal Reserve discount rate . . . as of the time from which interest is due." 6 Del. C. § 2301(a). The Federal Reserve discount rate as of March 26, 2020, was 0.25%.

*See APEX Fin. Options, LLC v. Gilbertson*, No. 19-cv-46, 2022 WL 4119759, at *2 (D. Del. Sept. 9, 2022); *Moon Express, Inc. v. Intuitive Machines, LLC*, No. 16-cv-344, 2018 WL 4972220, at *8 (D. Del. Oct. 15, 2018), *aff'd*, 788 F. App'x 117 (3d Cir. 2019) ("If it is possible to ascertain the date when the breach of contract occurred, then that date could be used as the date from which pre-judgment interest is computed."). The award of interest will be compounded quarterly. *See CertiSign Holding, Inc. v. Kulikovsky*, No. CV 12055-VCS, 2018 WL 2938311, at *29–30 (Del. Ch. June 7, 2018) (awarding prejudgment interest compounded quarterly on the ground that "compound interest is a more accurate means of measuring the time value of money" than simple interest); *ReCor Med., Inc. v. Warnking*, No. CV 7387-VCN, 2015 WL 535626, at *1 (Del. Ch. Jan. 30, 2015) (same).

Noramco's request for postjudgment interest has not been opposed by Dishman. *See generally* Dkt. No. 88. Accordingly, postjudgment interest will also be awarded to Noramco. Unlike prejudgment interest, which is governed by state law in diversity of citizenship cases, postjudgment interest in a diversity case accrues at the rate established by federal statute, which is "the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a); *Well Thrive Ltd. v. SemiLEDs Corp.*, No. 17-794, 2021 WL 1318131, at *2–3 (D. Del. Apr. 8, 2021) (collecting cases). That rate for the week preceding the date of today's judgment is 4.33 percent. Accordingly, postjudgment interest will accrue at a rate of 4.33% per annum.

### E. Attorneys' Fees

In its briefing on the issue of damages, Noramco also requests attorneys' fees. Dkt. No. 84 at 8–9. Dishman correctly points out that the Agreement does not contain a fee-shifting

provision, and in the absence of such a provision, the general rule under Delaware law[3]—known as the "American Rule"—is that "prevailing litigants are responsible for the payment of their own attorney's fees." *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1043–44 (Del. 1996). One "narrow exception" to that rule is that courts may award fees in the event that there is "clear evidence" that the non-prevailing party acted in "subjective bad faith." *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 232 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998).

The standard for obtaining attorneys' fees under the bad-faith exception is "arduous," and cases warranting an award of fees tend to involve "egregious" conduct such as falsifying documents, altering testimony, deceiving the court, or acting "contrary to substantial legal authority, the advice of counsel, and a judicial declaration." *Marra v. Brandywine Sch. Dist.*, No. CIV.A. 5574-VCN, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012) (citations omitted). In general, "a party acting merely under an incorrect perception of its legal rights does not engage in bad-faith conduct." *Id.*

Noramco does not appear to dispute the legal standard that applies to its request for attorneys' fees, and has submitted a document that it claims outlines the bad-faith conduct engaged in by Dishman. *See* Dkt. No. 84-13. The problem for Noramco is that although Dishman's legal theories were ultimately rejected at the summary judgment stage of this case, there is no evidence that Dishman *subjectively* acted in bad faith. And Noramco has certainly not provided the "clear evidence" that is required to meet the bad-faith standard. *See Arbitrium*, 705 A.2d at 232. The much more plausible view of Dishman's conduct in this case is that Dishman believed that the

---

[3] A federal district court sitting in diversity applies state law to requests for attorneys' fees. *Whiteside v. New Castle Mut. Ins. Co.*, 595 F. Supp. 1096, 1100 (D. Del. 1984).

14

olivetol it shipped to Noramco was cGMP-compliant because Dishman held an active cGMP certificate at the time of shipment. That belief was generally supported by the report of Dishman's expert, Dr. Rino Coladangelo. Although the court ultimately rejected Dishman's position, there is no evidence suggesting that Dishman held that view in bad faith. Accordingly, an award of attorneys' fees under the bad-faith exception is not warranted in this case. *See Marra*, 2012 WL 4847083, at *4.

## IV.     Motion to Dismiss

I next address Dishman's motion to dismiss for lack of subject matter jurisdiction. Dishman argues that Noramco's breach of contract claim is required to be resolved through arbitration and therefore this court lacks jurisdiction over Noramco's claim. Dishman's motion to dismiss is DENIED.

The arbitration provision of the Agreement expressly states that it applies to all disputes "[e]xcept for any disputes with respect to non-conforming Material, which shall be resolved in accordance with Section 4.3." Dkt. No. 69-2 § 12.4. Dishman argues that because Noramco failed to timely reject the olivetol as required by Section 4.3.1, Noramco's claim functions as a breach of warranty claim that may be adjudicated only through arbitration. Dkt. No. 83 at 8. However, as explained above, Noramco did not fail to timely reject the olivetol, and therefore the dispute is properly treated as a dispute under Section 4.3 of the Agreement. Moreover, regardless of whether the rejection procedures of Section 4.3.1 were followed, this is plainly a "dispute[] with respect to non-conforming Material," which is expressly carved out from the arbitration provision. Dkt. No. 69-2 § 12.4. Accordingly, Noramco's claim does not fall within the scope of the arbitration provision, and this court therefore does not lack subject-matter jurisdiction.

In its reply brief in support of its motion to dismiss for lack of subject matter jurisdiction, Dishman effectively concedes that a claim limited to the remedies provided by Section 4.3 of the Agreement is not subject to arbitration under Section 12.4 of the Agreement.  Dkt. No. 91 at 1.  Section 4.3 constitutes a "significant carve-out[]" from the arbitration provision.  *See id.* at 3 (quoting *Carder v. Carl M. Freeman Communities, LLC*, No. CIV.A. 3319-VCP, 2009 WL 106510, at *4 (Del. Ch. Jan. 5, 2009)).  Because I have held that Noramco is limited by the terms of the Agreement to the remedies set forth in Section 4.3, the arbitration provision in Section 12.4 has no application to this case.

### V.     Conclusion

In conclusion, each party's motion for summary judgment of damages is GRANTED IN PART, and Dishman's motion to dismiss for lack of subject matter jurisdiction is DENIED.  Noramco will be awarded damages in the amount of the purchase price of the olivetol plus the cost of disposing of the olivetol.  Noramco is also entitled to prejudgment interest and postjudgment interest.  Noramco is not entitled to attorneys' fees or damages for storage and financing costs.  A judgment will be filed contemporaneously with this order.

IT IS SO ORDERED.

SIGNED this 3rd day of February, 2023.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE