**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-1396
_____

NORAMCO LLC

v.

DISHMAN USA, INC.,
       Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1-21-cv-01696)
Circuit Judge: Honorable William C. Bryson*

_____

Argued March 11, 2024

Before: BIBAS, MONTGOMERY-REEVES, and ROTH, *Circuit Judges*.

(Opinion filed: July 16, 2024)

Stamatios Stamoulis   [**ARGUED**]
Stamoulis & Weinblatt
800 N West Street, 3rd Floor
Wilmington, DE 19801
 *Counsel for Appellant*

Jennifer M. Mohamed   [**ARGUED**]
Andrew J. Bayne
The Bayne Law Group
P.O. Box 3036
Princeton, NJ 08543
 *Counsel for Appellee*

_____

OPINION[**]

_____

MONTGOMERY-REEVES, *Circuit Judge*.

Dishman USA, Inc. ("Dishman") appeals the District Court's grant of summary judgment on the breach-of-contract claim that Noramco LLC ("Noramco") brought under Delaware law. For the reasons provided below, we will affirm in part and vacate in part the District Court's orders granting summary judgment and remand this case for further proceedings consistent with this opinion.

I.      BACKGROUND

    A.      The Failed Inspection

Dishman and Noramco entered into a supply agreement (the "Supply Agreement") under which Dishman agreed to supply Noramco with olivetol, a raw material used to manufacture active pharmaceutical ingredients. *See generally* S.A. 2–23 (hereinafter, "Supply Agreement § _").[1] Dishman agreed to manufacture the olivetol at its "cGMP-compliant manufacturing facilities" in India (the "India Facility"). *Id.* §§ 1.7, 2.1. "cGMP" referred to "current good manufacturing practices" recognized by food and drug

---

[*] The Honorable William C. Bryson, District Judge sitting by designation pursuant to 28 U.S.C. § 291(b).

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] This volume of the appendix is part of the public record.

2

regulators in the United States, the European Union, Switzerland, and other jurisdictions. *Id.* § 1.4.

In February 2020, representatives of the European Directorate for the Quality of Medicines & HealthCare ("EQDM") and the Swiss Agency for Therapeutic Products ("Swissmedic") inspected the India Facility. The inspection focused on whether the India Facility complied with cGMP and should be certified as such. While awaiting the inspection's result, Dishman manufactured several batches of olivetol for Noramco.

On March 19, EQDM informed Dishman that the India Facility was "not compliant with [cGMP]" and suspended the India Facility's certificates of suitability for two substances, neither of which was olivetol. S.A. 136. According to EQDM, inspectors flagged "one critical and several major deficiencies to [cGMP]" that, combined, "constitute[d] a critical risk of producing products[] which could be harmful to the patient," *id.*, including a major violation with a reactor unit that Dishman used to make the olivetol. EQDM "reminded" Dishman that it had a "responsibility to inform all [of its] customers about this decision." S.A. 141.

B.    **Rejection of Olivetol**

On April 16, EQDM denied Dishman's appeal of the failed inspection. EQDM explained that Dishman "did not provide information that would justify the reconsideration of the decision" "[c]onsidering . . . that there was a serious risk for the safety of human patients or animals due to the critical and major deficiencies raised by the inspection." S.A. 233. The next day, Dishman told Noramco that the India Facility failed a cGMP inspection. Dishman hedged, however, that the inspection purportedly

3

raised no concerns about olivetol because inspectors focused on other substances that Dishman manufactured at the India Facility.

On April 20, Swissmedic issued a statement of non-compliance with cGMP concluding that the India Facility "d[id] not comply with [cGMP]" and recommending that French authorities withdraw the India Facility's cGMP certificate. S.A. 144. EQDM followed suit the next day and provided Dishman with a "consolidated list of deficiencies" noting "a number of failures to comply with the principles and guidelines of [cGMP]." S.A. 148.

About a week later, Dishman sent Noramco an internet link to the Swissmedic report. Like before, Dishman equivocated about whether the failed inspection meant that Dishman did not manufacture the olivetol consistent with cGMP.

Dishman and Noramco continued to correspond about the olivetol. Among other things, Dishman provided Noramco with a risk analysis supposedly showing that the olivetol was safe and pure. And Noramco decided to open and sample some of the drums of olivetol, potentially rendering that olivetol worthless to other buyers. Finally, on August 19, Noramco sent a letter to Dishman formally rejecting the olivetol because it

"d[id] not meet the EU GMP standards" and thus deviated from what Dishman promised to deliver under the Supply Agreement. S.A. 253.

### C. Procedural History

Dishman appeared to agree to refund Noramco for the olivetol.[2] But that deal fell through. So Noramco sued Dishman for breaching the Supply Agreement.

During a hearing in October 2022, the District Court proposed an early "motion for Summary Judgment in the case, which would be predicated on the Swissmedic Report being dispositive" of whether Dishman breached the Supply Agreement. App. 466. The parties submitted briefs on liability. And the District Court held that there was no genuine dispute of material fact that Dishman breached the Supply Agreement. The parties then submitted briefs on damages. The District Court held that there was no genuine dispute of material fact about damages and granted Noramco summary judgment on the issues relevant to this appeal.[3] Dishman appealed.

---

[2] Noramco paid for the olivetol in June 2020.

[3] In its opinion granting summary judgment on damages, the District Court held that Dishman "forfeited the right to assert as a defense that Noramco failed to timely reject the olivetol" because Dishman did not make that argument when opposing summary judgment on liability. *Noramco LLC v. Dishman USA, Inc.*, No. 21-1696, 2023 WL 1765566, at *3 (D. Del. Feb. 3, 2023). Still, the District Court analyzed the merits of Dishman's untimely rejection argument and explained why the Court viewed that argument as wrong.

Dishman filed a motion for relief from judgment under Federal Rule of Civil Procedure 59(e) arguing that the District Court manifestly erred by treating Dishman's untimely rejection argument as forfeited and rejecting that argument on the merits. The District

## II.   DISCUSSION[4]

Dishman raises three issues on appeal.  First, is there a genuine dispute of material fact about whether Dishman breached the Supply Agreement by shipping defective olivetol?  Second, assuming that the olivetol was defective, is there a genuine dispute of material fact about whether Noramco timely rejected the olivetol?  Third, is there a genuine dispute of material fact about whether Noramco failed to mitigate damages?  We address each issue below.

### A.   Breach of Contract

Section 4.1 of the Supply Agreement provides that Dishman "shall . . . manufacture[] and store[] [olivetol] in accordance with all Appliable Laws relevant to

---

Court denied the motion for the same core reasons that the Court provided when granting summary judgment.

[4] The District Court had jurisdiction under 28 U.S.C. § 1332.  We have jurisdiction under 28 U.S.C. § 1291.

We review de novo the District Court's grant of summary judgment and denial of Dishman's Rule 59(e) motion on the same legal basis.  *See, e.g.*, *Addie v. Kjaer*, 737 F.3d 854, 867 (3d Cir. 2013) ("Our 'review of the substance of an order granting a summary judgment motion is plenary.'  We review motions to alter or amend a judgment filed pursuant to Rule 59(e) review for abuse of discretion, 'except over matters of law, which are subject to plenary review.'" (first quoting *St. Surin v. V.I. Daily News, Inc.*, 21 F.3d 1309, 1313 (3d Cir. 1994); and then quoting *Cureton v. NCAA*, 252 F.3d 267, 272 (3d Cir. 2001))).  In making that determination, we apply the same standard as the District Court, resolving all disputed facts and drawing all reasonable inferences in Dishman's favor.  *See, e.g.*, *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 144 (3d Cir. 2023) ("Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(a))).

the [India] Facility,"[5] including cGMP. That section further provides, "Each shipment of [olivetol] shall be accompanied by a certificate of analysis, which will include a signed certification of cGMP compliance . . . ."

Dishman argues that there is a genuine dispute of material fact about whether it manufactured the olivetol "in accordance with all Applicable Laws" because Dishman purportedly held a valid cGMP certificate when it manufactured the olivetol, and a risk analysis found that the olivetol was safe and pure.

Delaware courts "enforce the plain meaning of clear and unambiguous [contract] language." *Manti Holdings, LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)); *see also IFC Interconsult, AG v. Safeguard Int'l P'rs, LLC*, 438 F.3d 298, 319 (3d Cir. 2006) ("Under Delaware law, 'if a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.'" (quoting *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993))). To be ambiguous, contract language must be

---

[5] Section 1.3 of the Supply Agreement defines "Applicable Laws" broadly as "(a) all relevant federal, state and local laws, statutes, rules, codes of practice, regulations, and ordinances having jurisdiction over this Agreement, as well as industry standards and regulatory guidelines applicable to the manufacture and supply of [olivetol], including, the United States Federal Food, Drug and Cosmetic Act; (b) cGMPs; and (c) all applicable regulations and guidelines of any Regulatory Authority; in each case, together, with any and all amendments thereto."

"susceptible to more than one reasonable interpretation." *Manti*, 261 A.3d at 1208 (collecting cases).[6]

The Supply Agreement's plain meaning is clear: Under § 4.1, Dishman had to comply with all Applicable Laws—including cGMP—when manufacturing the olivetol. Dishman may have needed a valid cGMP certificate to manufacture the olivetol in accordance with Applicable Laws. But possessing a valid cGMP certificate does not mean that Dishman complied with cGMP when manufacturing the olivetol. To the contrary, the February 2020 inspection revealed pervasive failures with the India Facility's cGMP compliance just a few weeks before Dishman manufactured the olivetol, including a major violation with equipment that Dishman used to manufacture the olivetol. Dishman identifies no evidence suggesting that the India Facility fixed those problems before manufacturing the olivetol. So the only reasonable inference to draw is that Dishman did not comply with cGMP when it manufactured the olivetol because the India Facility was incapable of complying with cGMP at that time.

Similarly unavailing is Dishman's contention that it complied with the Supply Agreement because the olivetol was safe and pure. The plain language of § 4.1 required that Dishman comply with all Applicable Laws when manufacturing the olivetol. Noramco was entitled to receive exactly what Dishman promised to deliver under the

---

[6] Delaware law governs the breach-of-contract claim. *Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 212 (3d Cir. 2023) ("Here, Delaware contract law governs, as the parties selected it to apply . . . ."); Supply Agreement § 12.2 ("This Agreement shall be governed by, and construed and interpreted in accordance with, the substantive laws of the State of Delaware . . . .").

Supply Agreement. Regardless of whether the olivetol was adulterated under the Food, Drug, and Cosmetic Act (the "FDCA"),[7] a risk assessment concluding that the olivetol was safe and pure does not mean that the India Facility complied with cGMP's process-oriented requirements, like "perform[ing]" "cleaning validation[s]" and adopting sufficient "QA oversight and/or technical knowledge . . . to prevent[] risk of contamination/cross-contamination." S.A. 151, 154. The February 2020 inspection found that the India Facility was not complying with these requirements. Dishman adduced no evidence to the contrary.[8]

Accordingly, we agree with the District Court that there is no genuine dispute of material fact that Dishman breached the Supply Agreement by delivering defective olivetol. The only reasonable inference to draw from the undisputed evidence is that Dishman did not manufacture the olivetol "in accordance with all Applicable Laws"

---

[7] We express no view on whether the olivetol was adulterated under the FDCA.

[8] Dishman's argument that the olivetol complied with cGMP because it was not recalled is another way to say that Dishman complied with the Supply Agreement because the olivetol was safe and pure. That argument fails for the reasons provided above.

because the India Facility was not complying with cGMP when Dishman manufactured the olivetol. Supply Agreement § 4.1. So Dishman breached the Supply Agreement.[9]

## B. Timely Rejection

Even if Dishman breached the Supply Agreement by delivering defective olivetol, Noramco had to provide timely notice of rejection to recover for Dishman's breach. Under § 4.3.1 of the Supply Agreement, Noramco generally has "thirty (30) business days following its physical receipt of a shipment of [olivetol] to inspect and reject such [olivetol] on the grounds that all or part of the shipment fails to conform to the applicable Specifications." But if the olivetol has a "Latent Defect," Noramco can reject the olivetol "after the thirty (30) business days inspection period" provided that "[Noramco] informs [Dishman] in writing immediately, but no later than fifteen (15) business days," after Noramco "discover[ed] or . . . should have discovered" the Latent Defect.[10] Noramco is deemed to accept any batch of olivetol that it does not timely reject.

Again, the Supply Agreement's plain meaning is clear: Under § 4.3.1, Noramco had to provide written notice of rejection by the later of (a) 30 business days after

---

[9] Because the Supply Agreement is clear, we need not address the parties' course of dealing. *See, e.g.*, *In re Viking Pump, Inc. & Warren Pumps, LLC Ins. Appeals*, 148 A.3d 633, 648 (Del. 2016) ("When construing ambiguous contractual provisions, Delaware courts are permitted to consider the parties' course of dealing." (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997))).

[10] "Latent Defect" is "a hidden or latent defect not detected by the analytical test methods in operation at the date of shipment to [Noramco] by [Dishman] and which was not detected by [Noramco] during the inspection period . . . ." *Id.* § 1.10.

10

Noramco received the olivetol, or (b) 15 business days after Noramco discovered, or should have discovered, that the olivetol was defective because Dishman did not comply with cGMP. Dishman argues that Noramco failed to timely reject the olivetol because Noramco knew or should have known in April 2020 that the India Facility failed a cGMP inspection but waited until August to send its letter of rejection. Noramco responds that it "provided notice of Latent cGMP Defect on April 18 . . ., just 1-day after being informed by Dishman that certain suitability certificates at the [India] Facility had been revoked and that the parties conferred on the GMP issue consistent with contractual obligations." Appellee Br. 27.

Dishman has the better argument. Emails that the parties exchanged around April 18 show that Noramco was concerned about whether Dishman manufactured the olivetol in accordance with cGMP. But § 4.3.1 required written notice of "rejection," not concern. Noramco did not use the word "reject" or a synonym thereof when corresponding with Dishman on April 18 about the olivetol. Moreover, Noramco's decision to test the olivetol and entertain a risk analysis supports a reasonable inference that Noramco still was deciding whether to reject the olivetol. And Noramco's decision to formally reject the olivetol in August supports a reasonable inference that Noramco did not reject the olivetol four months earlier, in April. There is thus a genuine dispute of material fact about whether Noramco rejected the olivetol on April 18.

This leaves the possibility that Noramco's August 19 letter provided timely notice of rejection. The question here is whether rejection was timely, not whether Normaco conveyed rejection. More than 30 business days passed between when Noramco received

the olivetol in April and when Noramco sent its rejection letter in August. So the August letter provided timely notice of rejection only if Noramco first knew—and reasonably should have first known—that the olivetol had a Latent Defect on August 19 (or within the preceding 15 business days). Noramco cites no evidence that it did not know—and should not reasonably have known—until August 19 (or within the preceding 15 business days) that the olivetol was defective because Dishman did not comply with cGMP.[11] As such, there is a genuine dispute of material fact about whether Noramco's August 19 letter provided timely notice of rejection.[12] And the District Court erred by granting summary judgment on liability because there is a genuine dispute of material

---

[11] The District Court held that "[t]here is no evidence in the record that either Dishman or Noramco reached a conclusive determination that the [olivetol] was unusable before Noramco formally rejected the olivetol in August 2020." *Noramco*, 2023 WL 1765566, at *3. So it held that Noramco's August 19 letter provided timely notice of rejection. *See id.* Because Noramco had to provide notice of rejection within 15 business days after it "discover[ed] or . . . *should have* discovered" a Latent Defect, Supply Agreement § 4.3.1 (emphasis added), we see no reason to hold that the defect with the olivetol remained latent until Noramco conclusively determined that Dishman did not comply with cGMP.

[12] Because there is a genuine dispute of material fact about whether Noramco timely rejected the olivetol, we need not address whether Noramco accepted the olivetol by paying for it.

12

fact about whether Noramco timely rejected the olivetol under § 4.3.1 of the Supply Agreement.[13]

## C. Duty to Mitigate Damages

The final issue on appeal is whether the District Court erred by holding that Noramco did not fail to mitigate damages because the defective olivetol was worthless. Under Delaware law, "[a] party has a general duty to mitigate damages if it is feasible to do so." *Brzoska v. Olson*, 668 A.2d 1355, 1367 (Del. 1995) (collecting cases); *see also Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1026 n.23 (Del. 2001) ("[D]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden[,] or humiliation." (quoting Restatement (Second) of Contracts § 350(1) (Am. L. Inst. 1981))); *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch. 1992)

---

[13] As noted above, the District Court stated that "Dishman . . . forfeited the right to assert as a defense that Noramco failed to timely reject the olivetol" by not raising that issue when opposing Noramco's early motion for summary judgment on liability. *Noramco*, 2023 WL 1765566, at *3. "[F]orfeiture is the failure to make the timely assertion of a right . . . ." *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017) (first alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

The District Court's comments during the October 24, 2022, telephonic hearing could reasonably be interpreted as limiting the scope of the early summary judgment motion to whether Dishman breached the Supply Agreement by delivering defective olivetol. And Dishman fairly raised an untimely rejection argument in its first brief opposing summary judgment on damages. Thus, we hold that Dishman did not forfeit its untimely rejection argument by failing to raise that argument when opposing Noramco's early motion for summary judgment on liability.

13

(plaintiff has duty to mitigate damages but "need not take unreasonably speculative steps to meet that duty").

Dishman argues that there is a genuine dispute of material fact about whether Noramco violated its duty to mitigate damages by opening and testing some of the drums of olivetol, thereby "render[ing] the [o]livetol unusable by any other customer." Opening Br. 44. Noramco responds that it did not fail to mitigate damages because it could not accept "product that violates U.S. law and [would] compromise [Noramco's] global supply chain." Appellee Br. 29.

While perhaps a close call, Dishman has the better argument. Regardless of whether the olivetol was adulterated and thus could not be used to manufacture active pharmaceutical ingredients in the United States or Europe, the record does not contain undisputed evidence showing that the olivetol could not be used for another lawful purpose. Noramco's consideration of a risk analysis and decision to test the olivetol supports a reasonable inference that the olivetol had residual value. And Dishman adduced evidence that Noramco's unilateral decision to open the drums made it impossible for Dishman to sell the olivetol to another lawful buyer. Thus, the question is not whether Noramco breached its duty to mitigate damages by rejecting non-conforming olivetol: Noramco was entitled to perfect tender and had a contractual right to timely reject imperfect goods. Rather, the question is whether Noramco's unilateral actions prevented Dishman from selling the olivetol to another lawful buyer. The record supports a reasonable inference that Noramco destroyed or diminished the olivetol's residual value by opening the drums. So there is a genuine dispute of material fact about

14

whether Noramco failed to mitigate damages.[14]   And the District Court erred by granting summary judgment on mitigation.[15]

## III.   CONCLUSION

For the reasons discussed above, we will affirm in part and vacate in part the District Court's orders granting Noramco summary judgment and remand this case for further proceedings consistent with this opinion.

---

[14] Noramco can argue at trial that "Dishman could have mitigated its own losses simply by arranging for the return of the [o]livetol as its CEO promised it would." Appellee Br. 30.  We cannot resolve that factual dispute at summary judgment, however, given the record presented on appeal.

[15] We express no view on the District Court's other rulings related to damages, which neither party challenges.