IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORAMCO LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 21-1696-WCB |
| DISHMAN USA, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

This contract dispute case is before the court on remand from the Third Circuit Court of Appeals and is set for trial in January 2026. The plaintiff, Noramco LLC ("Noramco"), has filed a motion to exclude the opinion testimony of Dr. Rino Coladangelo, an expert witness for the defendant, Dishman USA, Inc. ("Dishman"). Noramco has filed an opening brief in support of its motion, Dkt. No. 157; Dishman has responded, Dkt. No. 176; and Noramco has filed a reply, Dkt. No. 180. For the reasons set forth below, the motion to exclude the opinion testimony of Dr. Coladangelo is GRANTED-IN-PART and DENIED-IN-PART.

**I. BACKGROUND**

Noramco and Dishman entered into a contract ("the Supply Agreement") under which Dishman agreed to provide Noramco with a large amount of olivetol, an ingredient used in the manufacture of pharmaceutical products. *Noramco LLC v. Dishman USA, Inc.*, No. 23-1396, 2024 WL 3423711 *1 (3d Cir. July 16, 2024). The Supply Agreement required Dishman to supply Noramco with olivetol manufactured at Dishman's facilities in India. The Agreement represented that those facilities were "c-GMP compliant," i.e., compliant with the current Good Manufacturing

1

Practice standards set by the U.S. Food and Drug Administration. *Id.*; Dkt. No. 69-2 §§ 1.4, 1.7, 2.1, 4.1, 10.2.1.

In February 2020, the European Directorate for the Quality of Medicines & HealthCare ("EQDM") inspected Dishman's facility in India where the olivetol was manufactured. The EQDM subsequently informed Dishman on March 19, 2020, that the facility had failed the inspection and was not compliant with cGMP. *Noramco*, 2024 WL 3423711, at *1.

The batches of olivetol at issue in this case were manufactured by Dishman after the failed inspection. The were shipped by Dishman on March 26, 2020, and received by Noramco on April 2, 2020. *Noramco LLC v. Dishman USA, Inc.*, No. 21-1696, 2023 WL 1765566 *1 (D. Del. Feb. 3, 2023). After an exchange of emails between the parties regarding the effect of the failed inspection, Noramco rejected the olivetol and sought a refund of the amount Noramco had paid for the product. When Dishman refused to accept the return of the olivetol and to return the funds Noramco had paid for the olivetol, Noramco brought this action seeking damages for breach of contract.

I granted summary judgment to Noramco on its breach of contract claim, and Dishman appealed. On appeal, the Third Circuit affirmed as to Dishman's breach of the Supply Agreement. *Noramco*, 2024 WL 3423711, at *4. The Third Circuit remanded the case, however, to resolve factual disputes with regard to two other issues: (1) "whether Noramco timely rejected the olivetol under § 4.3.1 of the Supply Agreement" and (2) "whether Noramco failed to mitigate damages." *Id.* at *3–6. On remand, I denied the parties' cross motions for summary judgment and set the case for trial because I determined that genuine disputes of material fact remain with regard to both issues. Dkt. No. 191.

2

## II. DISCUSSION

### A. The Dispute over Dr. Coladangelo's Testimony

Dishman proposes to call Dr. Rino Coladangelo, a medical doctor with experience in the field of pharmaceutical compliance, as an expert witness at trial. Dkt. No. 176 at 1–2. Noramco challenges Dr. Coladangelo's qualifications as an expert and argues that his reports "lack reliable methodology, are based on unsupported speculation, offer legal conclusions, opine on Plaintiff's state of mind, and do not establish the expert's qualifications in the relevant subject matter." Dkt. No. 157 at 10. Accordingly, Noramco asks the court to exclude Dr. Coladangelo's opinion testimony at trial. Dkt. No. 156 at 1. Dishman responds that "Dr. Coladangelo's background and experience are directly on point with the subject for which he seeks to proffer an opinion[,]" that his opinions "are grounded in verifiable facts," and that "his analysis is reliable." Dkt. No. 176 at 6.

### B. The Governing Legal Standard

Under Federal Rule of Evidence 702, the proponent of an expert witness must demonstrate that the witness is "qualified as an expert by knowledge, skill, experience, training, or education" by demonstrating that each of four requirements is met. First, the proponent of the evidence must show that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Second, the proponent must show that "the testimony is based on sufficient facts or data." Third, the proponent must show that "the testimony is the product of reliable principles and methods." Finally, the proponent must show that the expert's opinion "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court emphasized the importance of the gatekeeping function of the trial judge in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." The Court explained that such testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known," *id.* at 590, and that it must have "a valid scientific connection to the pertinent inquiry" in order to assist the trier of fact, *id.* at 592. The Court has made clear that those principles are not limited to scientific testimony, but extend to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–49 (1999).

The Third Circuit has characterized the showing that the sponsor of an expert witness must make under Rule 702 and the *Daubert* case as consisting of three components: (1) the witness must be a qualified expert in the field relating to his testimony; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must be reliable, and that reliable testimony must assist the trier of fact by fitting the issues in the case, a requirement more demanding than bare relevance. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806, 809–10 (3d Cir. 1997); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43, 745 & n.13 (3d Cir. 1994). Moreover, the trial judge is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). To the contrary, "[i]t is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002); *see also Elcock v. Kmart*, 233 F.3d 734, 756 n.13 (3d Cir. 2000).

4

### C. The Limits of Dr. Coladangelo's Qualifications

Noramco challenges Dr. Coladangelo's qualifications as an expert witness, arguing that he "has no 'scientific, technical, or other specialized knowledge' that qualifies him as an expert to testify as to the two matters on remand." Dkt. No. 157 at 10. Specifically, Noramco contends that Dr. Coladangelo lacks "specialized knowledge in legal standards for contract rejection or quality assurance protocols" and that his "opinions on marketability and commercial impact exceed his expertise." *Id.* As the party calling Dr. Coladangelo to testify as an expert witness, Dishman bears the burden of showing that it is more likely than not that Dr. Coladangelo has the qualifications to offer expert testimony on the subjects about which he is called to testify. *See* Fed. R. Evid. 702.

Dr. Coladangelo's *curriculum vitae* states that he is a physician and that from April 2009 until October 2021, he served as Chief Executive Officer of Rephine Ltd., a global pharmaceutical consultancy specializing in quality compliance in manufacturing, and regulatory affairs. Dkt. No. 157-7 at 30. In that capacity, the entry notes that Dr. Coladangelo "led the training and development of the staff and consultants, as well as accreditation of specialty staff." *Id.*; *see* Dkt. No. 69-12 at 1.[1]

Based on Dr. Coladangelo's experience at Raphine Ltd., I find that Dr. Coladangelo is qualified to testify as an expert on matters of quality compliance and regulatory affairs in the pharmaceutical industry. However, Dr. Coladangelo's expertise in the field of pharmaceutical quality compliance and regulatory affairs does not qualify him to testify on legal issues or the state

---

[1] The record contains four reports from Dr. Coladangelo. For the purposes of this case on remand, I assume that Dr. Coladangelo's operative expert report is his April 3, 2025 report, Dkt. No. 157-1, as supplemented by his May 13, 2025, report, Dkt. No. 157-2. The record also contains a report dated June 15, 2022, Dkt. No. 69-12, and a supplemental report dated October 28, 2022, Dkt. No. 157-7. Except when otherwise noted, references in this opinion are to the 2025 report and response. In addressing the issues in dispute, however, I have also considered information contained in the 2022 reports.

of mind of representatives of the opposing party, which are the subjects of much of his expert report.

An expert witness "is prohibited from rendering a legal opinion," because doing so "would usurp the District Court's pivotal role in explaining the law to the jury." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (citing *First Nat'l State Bank of New Jersey v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981)); *see* Fed. R. Evid. 704.

In his report, Dr. Coladangelo states that "[t]he supply agreement makes clear that any rejection of material must be made within 30 working days of receipt" and that the actions taken by Noramco "contravene the terms of the agreement." Dkt. No. 157-1 at 7, 8. Dr. Coladangelo lacks the qualifications to provide an opinion interpreting the contract in this case, and even if he were qualified to give such an opinion, it would be improper for him to express a legal opinion as to whether Noramco failed to comply with the terms of the Supply Agreement, which is an ultimate issue in this case.

Dr. Coladangelo also will not be permitted to testify as to the state of mind of Noramco's representatives. "Experts may not testify to a party's state of mind." *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 250, 261 (E.D. Pa. 2021) (citing *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019)). Dr. Coladangelo's report asserts that "after a period of delay, and knowing the terms of the supply agreement precisely, [Noramco] informed [Dishman] of rejection of the product well beyond the timeframe specified by the agreement." Dkt. No. 157-1 at 8. His report further states: "Cleary Noramco was aware of the implication of its actions and their consequences." *Id.* at 7. Both statements claim knowledge of the opposing party's state of mind, which is an impermissible subject for expert testimony. The first quoted statement also draws an impermissible legal opinion. To the extent Dr. Coladangelo purports to offer legal

opinions or speculate as to the Noramco representatives' state of mind, his testimony will be excluded.

### D. The Reliability of Dr. Coladangelo's Testimony

As in the case of Dr. Coladangelo's qualifications, Dishman bears the burden of demonstrating that Dr. Coladangelo's testimony rests on "good grounds." *See Daubert*, 509 U.S. at 590. A court may not admit testimony that lacks any factual foundation and consists merely of *ipse dixit* assertions on the part of the expert. *See Joiner*, 522 U.S. at 146; *Stecyk*, 295 F.3d at 414. Upon consideration of the arguments made by the parties and a review of Dr. Coladangelo's reports at Dkt. Nos. 157-1 and 157-2, I am persuaded that Dr. Coladangelo's reports contain opinions that lack sufficient supporting facts or data, or that lack a reliable methodology. Accordingly, testimony based on the parts of the reports summarized below will be excluded.

First, Dr. Coladangelo's report contains a list of 24 manufacturers of medicinal THC and asserts that "[s]ome of these might have been interested in acquiring the Olivetol batches." Dkt. No. 157-1 at 5. Aside from the list of THC manufacturers, the report contains no other facts, data, or methodology supporting Dr. Coladangelo's conclusion that all or some number of the listed manufacturers might have been willing to purchase the non-compliant olivetol. In that respect, Dr. Coladangelo's assertion is similar to that of the experts in *Slatowski v. Sig Sauer, Inc.*, 148 F.4th 132, 138 (3d Cir. 2025), who gave testimony based on evidence that a particular "design *could have* caused an accident," but did not testify that it "*did* cause this accident." As in the case of the experts in *Slatowski*, Dr. Coladangelo's theory that the THC manufacturers might have been interested in the non-compliant olivetol appears to lack factual support. Similarly, in *Adkins v. Marathon Petroleum Co.*, 105 F.4th 841, 850 (6th Cir. 2024), the Sixth Circuit affirmed the district court's decision to exclude an expert witness because the expert's conclusory report lacked "rigor

7

and detail" in asserting "without any elaboration" that a party's exposure to a certain chemical and fumes caused lung damage. Dr. Coladangelo's qualifications allow him to testify as to his expert opinion on industry practices regarding certain pharmaceutical products. However, expert testimony as to the willingness of the THC manufacturers to buy the non-compliant olivetol requires some additional facts or data, or a discussion of a methodology as to which I can assess reliability. I cannot find such a connection based merely on Dr. Coladangelo's *ipse dixit* statements on those subjects.

Second, Dr. Coladangelo's report points to Noramco's failure to promptly reject the olivetol and its act of sampling the product as causing a reduction in the shelf life and marketability of the olivetol. Dkt. No. 157-1 at 8. According to Dr. Coladangelo, "[n]on-conformity with the proper protocol would make the material unusable by others." Dkt. No. 157-1 at 4. But Dr. Coladangelo's report provides no facts or data about what the proper protocol might have been in this case—or even the industry standard for such a protocol. Additionally, the statement in the report does not identify for whom the olivetol would be unusable. It may be the case that the marketability of the non-compliant olivetol was reduced by the actions taken by Noramco. And Dr. Coladangelo may have the experience necessary to help the finder of fact understand standard industry practice and how actions taken by Noramco did or did not deviate from that practice. Dr. Coladangelo could even rely on his knowledge of industry practices to form an opinion on that issue, provided that facts in the record offer support. *See United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir. 1991) (noting expert testimony regarding "business customs and practices" is permitted); *Colon v. Mountain Creek Waterpark*, 465 F. App'x 186, 192 (3d Cir. 2012) (holding that "there was sufficient evidence in the record" to support the expert's opinion); *Ambassador Advisors, LLC,* 576 F.Supp.3d at 257 (noting that experts may testify to industry custom and

8

practice). But Dr. Coladangelo's naked assertion that non-conformity would make the olivetol unusable by others lacks sufficient support in facts, data, or methodology. As such, it does not pass the threshold requirement of reliability.

Third, Dr. Coladangelo asserts in his report that the non-cGMP compliant olivetol "could still be used if a Risk Assessment Analysis (RAA) is undertaken." Dkt. No. 157-1 at 3. In support of that assertion, Dr. Coladangelo cites certain guidelines from the EQDM and notes that certain other pharmaceutical products have been accepted by Belgian, German, and Brazilian manufacturers following an RAA. Whether the non-compliant olivetol could be used by others after an RAA may be relevant to the issue of mitigation of damages. Dr. Coladangelo's report, however, lacks additional facts, data, or methodology to say that the non-compliant olivetol could be used in the same way as the products listed as examples in his report. Dr. Coladangelo argues that the experience with those other products gives rise to an "implication" that olivetol could have been used under the same circumstances, but an implication without more lacks the methodological rigor I am required to apply to expert testimony under *Daubert* and Rule 702. *Daubert* requires more than an implication.

Under *Daubert*, I am charged with ensuring an expert's "reasoning or methodology underlying the testimony is scientifically valid" and applicable to the facts of the case. *Daubert*, 509 U.S. at 592–91. As a point of comparison, Dr. Coladangelo's October 28, 2022, report supplies facts and a methodology to link menthadienol and olivetol by noting that they are "subject to the same regulations" and "manufactured in the same way and used in similar finished products." Dkt. No. 157-7 at 5. No such methodology is set forth in Dr. Coladangelo's 2025 report to show why olivetol can be treated in the same way as bedaquiline, polyquat, and thioridazine. Dkt. No. 157-1 at 3. Without some reasoning or methodology to connect the use of

an RAA to the olivetol at issue beyond an "implication" or speculation, Dr. Coladangelo's conclusion regarding olivetol's potential use after an RAA lacks the scientific support that *Daubert* demands.

Federal Rule of Civil Procedure Rule 26 requires that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them" as well as "the facts or data considered by the witness in forming them."[2] Fed. R. Civ. P. 26(a)(2)(B). The testimony of expert witnesses is limited to the information contained in their expert reports unless the failure to disclose is "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1286–87 (Fed. Cir. 2011); *Johnson v. Vanguard Mfg., Inc.*, 34 F. App'x 858, 859 (3d Cir. 2002); *Liqwd, Inc. v. L'Oreal USA, Inc.*, No. 17-14, 2019 WL 10252611, at *1 (D. Del. June 25, 2019); *Parallel Networks Licensing, LLC v Int'l Bus. Machs. Corp.*, No. 13-2072, 2017 WL 1405155, at *1–2 (D. Del. Apr. 17, 2017); *nCube Corp. v. SeaChange Int'l, Inc.*, 809 F. Supp. 2d 337, 347 (D. Del. 2011); *Stored Value Sols., Inc. v. CardActivation Techs., Inc.*, No. 09-495, 2010 WL 3834457, at *2 n.1 (D. Del. Sept. 27, 2010) (Stark, J.) ("[T]he court will, as I must, limit the expert testimony

---

[2] Dr. Coladangelo introduces his role as "an independent expert witness" in his May 13, 2025, report and notes in his deposition that he is uncompensated and has not been retained. Dkt. Nos. 157-2; 157-6 at 14:20–15:23, 34:7–18. To the extent that Dr. Coladangelo intends to represent himself as a witness not "retained or specially employed to provide expert testimony in the case," Fed. R. Civ. P. 26(a)(2)(B), I find the argument unpersuasive. Dishman brought Dr. Coladangelo into the case for his opinion as an expert after litigation commenced. Dkt. No. 157-6 at 15:24–17:10; *see Downey v. Bob's Disc. Furniture Holdings, Inc.* 633 F.3d 1, 7 (1st Cir. 2011) ("[I]f, however, the expert comes to the case as a stranger and draws the opinion from facts supplied by others, in preparation for trial, he reasonably can be viewed as retained or specially employed."); *accord Marquinez v. Dole Food Co.*, No. 12-695, 2025 WL 1504856 at *1 (D. Del. May 27, 2025) (Andrews, J.). Even if he were not regarded as a retained or specially employed expert witness, Dr. Coladangelo would still be required to provide "a summary of the facts and opinions" to which he intends to testify, Fed. R. Civ. Pro. 29(a)(2)(C), and the principles of *Daubert* and Rule 702 would still apply to the admissibility of his testimony.

at trial to that disclosed in the expert reports."). Dr. Coladangelo will therefore be limited to testifying only as to the opinions contained in his reports, which includes any reasonable degree of elaboration and/or synthesis of the original contents of those reports. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 581 (D. Del. 2008).

### E.  The Fit of Dr. Coladangelo's Testimony

Dr. Coladangelo's testimony must also address the issues in the case so that they "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). If the testimony does not relate directly to an issue in the case, it is neither relevant nor helpful. *See Daubert*, 509 U.S. at 591. On remand, there are only two issues remaining in this case: (1) the timeliness of Noramco's rejection and (2) the mitigation of Dishman's damages. As such, Dr. Coladangelo's expert testimony must help the trier of fact decide one or the other of those two issues.

On the issue of timely rejection, Dr. Coladangelo's opinions, as expressed in his report, are of limited value to the trier of fact. The timely rejection issue is primarily a question of contract interpretation as applied to the series of events and correspondence that unfolded between Noramco and Dishman. The testimony that Dr. Coladangelo is qualified to give on pharmaceutical compliance and regulatory affairs does little to help resolve whether Noramco timely rejected the olivetol at issue. Dr. Coladangelo's qualifications to offer testimony on industry custom and practice may enable him to assist the trier of fact in understanding pharmaceutical industry practice for rejecting and returning non-compliant products. *See Leo*, 941 F.2d at 196. But his report contains only limited references to such practices. And where it does, the lack of factual support or methodology raises the reliability concerns discussed above. As such, his expert testimony is questionable as to the fit with the timely rejection issue.

11

On the issue of mitigation of damages, however, the opinions offered by Dr. Coladangelo may offer some assistance to the finder of fact in determining whether Noramco's actions constituted reasonable steps to mitigate Dishman's damages under the circumstances. Dr. Coladangelo may be able to help the finder of fact understand industry customs and practices for regulatory compliance testing and for opening and resealing tested materials. However, any such testimony would still need to be (1) addressed to a topic about which Dr. Coladangelo is qualified to speak, (2) reliably based on data or methodology, and (3) supported by opinions disclosed in his expert report. Because Dr. Coladangelo's proffered testimony offers a better fit with the mitigation of damages issue than with the timely rejection issue, he will be permitted to testify on that issue, but only to the extent that his testimony meets those requirements.

### III. LIMITATIONS ON TESTIMONY

Based on the analysis set forth above, I conclude that Dr. Coladangelo will not be permitted to testify as to the following subjects set forth in his expert reports.

(1) "On August 19, 2020 Noramco rejected the Olivetol supplied due to GMP non-compliance. Noramco made no effort to mitigate the issue, simply rejecting the Olivetol supplied 3 months later than the agreement allows. This reduced the validity period of the batches by 4 months prior to their expiry date." Dkt. No. 157-1 at 1–2. That statement is conclusory; it simply restates Dishman's position on the two legal issues remaining in the case; and it does not reflect the application of Dr. Coladangelo's expertise to any fact in dispute in the case.

(2) "The evidence establishes that Noramco understood no later than 17 April 2020 that the Olivetol supplied by [Dishman] would not be GMP compliant, . . . there appears to be little doubt that Noramco considered using the Olivetol as originally

12

intended . . . ." Dkt. No. 157-1 at 7. That statement speculates as to the state of mind of Noramco's representatives and is not an application of Dr. Coladangelo's expertise.

(3) "The Noramco Director of Quality stated that the Olivetol did not need to be GMP compliant for use in further manufacture." Dkt. No. 157-1 at 7. That statement does not qualify as expert testimony and is based on an inaccurate representation of the deposition testimony, as corrected at Dkt. No. 157-5. It is clear from context and the correction made by the witness that the original transcript of the witness's statement was inaccurate. The original transcript will not be allowed to be used as a basis for Dr. Coladangelo's statement at trial.

(4) "The supply agreement makes clear that any rejection of material must be made within 30 working days of receipt. Having received the product on 4 April 2020, this deadline would have been 15 May 2020." Dkt. No. 157-1 at 7. That statement sets forth a legal opinion that Dr. Coladangelo is not qualified to provide.

(5) "The discovery of a latent defect would have allowed a further 15 days to this period, but Noramco was clear that there was no latent defect." Dkt. No. 157-1 at 7. That statement expresses a legal opinion and draws a conclusion from the evidence that is not within Dr. Coladangelo's expertise.

(6) "Clearly Noramco was aware of the implication of its actions and their consequences." Dkt. No. 157-1 at 7. That statement consists of impermissible speculation as to the state of mind of Noramco's representatives and does not reflect an application of Dr. Coladangelo's expertise.

(7) "It is clear that having received the Olivetol, Noramco took the usual steps necessary to confirm its usability, and having done so paid for the product. However, after a period of delay, and knowing the terms of the supply agreement precisely, [Noramco] informed [Dishman] of rejection of the product well beyond the timeline specified by the agreement." Dkt. No. 157-1 at 8. That statement consists of a legal opinion going to an ultimate issue in the case; it does not constitute an application of Dr. Coladangelo's expertise.

(8) "There are few manufacturers of Olivetol but there were many other potential pharmaceutical manufacturer customers who might have been prepared to undertake an RAA and accept the Olivetol." Dkt. No. 157-1 at 8. That statement lacks factual support, is speculative, and lacks any indication that Dr. Coladangelo has personal knowledge supporting the asserted opinion.

(9) "Regardless of the GMP status of the Olivetol, the product could still be used if a Risk Assessment Analysis (RAA) is undertaken and the results thereof are satisfactory." Dkt. No. 157-1 at 3. That statement lacks factual support.

(10) "Non-conformity with the proper protocol would make the material unusable by others." Dkt. No. 157-1 at 4. That statement lacks factual support.

(11) "There are at least 24 Manufacturers of medicinal grade THC. Some of these might have been interested in acquiring the Olivetol batches." Dkt. No. 157-1 at 5. The statement that some of the manufacturers of medicinal grade THC might have been interested in acquiring the olivetol is speculative and lacks factual support.

 **(12)** "In any case, the delay by Noramco in deciding or not whether to use the Olivetol further reduced the validity of the batches, or 'shelf life,' reducing the value of the product." Dkt. No. 157-1 at 8. That statement lacks factual support.

 **(13)** "[T]he spoiling of the barrel seals of the Olivetol also negatively affected the marketability of the material to other potential purchasers." Dkt. No. 157-1 at 8. That statement lacks factual support.

 **(14)** "The fact that the material has been sampled and is not on the premises of the manufacturer introduces a further impediment to any other potential buyer of that material that would negatively impact the marketability and sale of the resealed product." Dkt. No. 157-2 at 1. That statement lacks factual support.

## IV. CONCLUSION

For the reasons stated above, Noramco's motion to exclude opinions and testimony of Dr. Coladangelo is granted-in-part and denied-in-part. While there are portions of Dr. Coladangelo's report (and, thus, his proposed testimony) that are legitimately within his expertise, much of his report reads like the first closing argument for the defendant. It appears to be an example of the increasingly common practice of allowing the presentations of expert witnesses to bleed over from expert testimony on discrete factual issues into legal argument on the merits of their proponent's case. That is decidedly not the role of expert witnesses, and that practice will not be allowed in this case. Counsel for Dishman must exercise care to ensure that Dr. Coladangelo's testimony at trial does not venture into the impermissible areas I have described above and that his testimony is within the limits of allowable testimony for an expert witness. The same rule will be applied to counsel for Noramco with regard to any expert witness offered by Noramco.

IT IS SO ORDERED.

SIGNED this 16th day of October, 2025.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE